**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

---

| | |
|---|---|
| **ANTONIO HARRIS** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. _____** |
| ) | |
| **EQUIFAX INFORMATION SERVICES, LLC** ) | |
| SERVE:   Corporation Service Company, Reg. Agent ) | |
| 100 Shockoe Slip, FL 2 ) | |
| Richmond, VA 23219-4100 ) | |
| ) | |
| ) | |
| **EXPERIAN INFORMATION SOLUTIONS, INC.,** ) | |
| SERVE:   CT Corporation System, Reg. Agent ) | |
| 4701 Cox Rd., Ste. 285 ) | |
| Glen Allen, VA 23060-6808 ) | |
| ) | |
| ) | |
| ) | |
| **TRANS UNION, LLC,** ) | |
| SERVE:   Corporation Service Company, Reg. Agent ) | |
| 100 Shockoe Slip, FL 2 ) | |
| Richmond, VA 23219-4100 ) | |
| ) | |
| ) | |
| **NELNET SERVICING, LLC,** ) | |
| SERVE:   CT Corporation System, Reg. Agent ) | |
| 4701 Cox Rd., Ste. 285 ) | |
| Glen Allen, VA 23060-6808 ) | |
| ) | |
| **and** ) | |
| ) | |
| **UNITED STATES DEPARTMENT OF** ) | |
| **EDUCATION** ) | |
| SERVE:  Erik S. Siebert, United States Attorney General ) | |
| 919 E Main St ) | |
| Suite 1900 ) | |
| Richmond, VA  23219 ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Antonio Harris, by counsel, and for his Complaint against Defendants Equifax Information Services, LLC ("Equifax), Experian Information Solutions, Inc. ("Experian"), Trans Union, LLC ("Trans Union"), Nelnet Servicing, LLC ("Nelnet"), and the United States Department of Education ("DOE"), he states as follows:

## PRELIMINARY STATEMENT

1.      This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2.      Equifax, Experian, and Trans Union are the USA's major consumer reporting agencies (hereinafter, these 3 are collectively referred to as the "CRAs" or "CRA Defendants").

3.      The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

4.      Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination'", as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local

law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights".

5.    Not only do inaccurate consumer reports lead to discrimination against consumers, but they also make it more difficult for banks and other finance companies to efficiently extend offers of credit to qualified individuals. The most obvious example occurs when a consumer applies for credit, is subsequently denied due to inaccurate information on their report, and the lender loses what would have been a potential customer. The inaccuracies not only harm the consumer, but they also deny the potential lender an opportunity to assess that consumer's creditworthiness accurately.

6.    In addition to relying on consumer reports to evaluate direct credit applications, many companies use CRAs to "prescreen" consumers' eligibility for particular offers.

> In prescreening, a creditor or insurer establishes a set of specific credit criteria (such as a minimum credit score) and requests from a CRA the names, addresses, and certain other information on consumers in the CRA's database who meet the specified criteria. Alternatively, the creditor or insurer may provide a list of potential customers to the CRA and request that the CRA identify which consumers on that list meet the established credit criteria.

BD. OF GOVERNORS OF THE FED. RESERVE SYS., *Report to the Congress on Further Restrictions on Unsolicited Written Offers of Credit and Insurance*, 7 (2004), Available at https://www.federalreserve.gov/boarddocs/rptcongress/UnsolicitedCreditOffers2004.pdf.

7.    If there is inaccurate information on a consumer's report, the CRA and lender may wrongfully exclude that consumer from certain "prescreened" offers. In this situation, the inaccuracies both preclude the individual consumer from receiving the credit offers and impede the lender's ability to use prescreening as a tool for "market efficiencies and better control of risks" *See, e.g., id*. at 10.

8.      Plaintiff is a victim of identity theft. An unknown individual opened student loan accounts in Plaintiff's name, without Plaintiff's permission or knowledge.

9.      When Plaintiff discovered the fraudulent accounts reporting on his credit, he disputed the information with the CRAs.

10.     The CRAs, Nelnet, and the Department of Education all failed to fulfill their obligations to Plaintiff under the FCRA.

11.     The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

12.     The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Nelnet and the Department of Education, particularly when a consumer makes a dispute about information reported.

13.     Also, when a consumer like Plaintiff disputes the accuracy of information with the CRAs, the CRAs must transmit that dispute to the entity who furnished the information. After receiving a consumer's disputes from the CRAs, the furnisher is then obligated to conduct its own, independent investigation of that dispute. *Id.* § 1681s-2(b).

14.     The Department of Education frequently uses agents to fulfill its loan servicing obligations, including obligations related to credit reporting. For the loans that are the subject of this Complaint, the Department of Education used entities named Nelnet, Inc. ("Nelnet") and Great Lakes Educational Loan Services, Inc. ("GLELSI").

15.     Nelnet acquired the GLELSI student loan servicing business in 2018.

16.     After Nelnet acquired GLELSI's student loan servicing business, any loans that reported on Plaintiff's credit as being serviced by GLELSI were actually serviced by Nelnet.

17.     The Department of Education and Nelnet reported these loans on Plaintiff's credit as "DEPT OF ED/NELNET" and "US Dept. of Education/Glelsi".

18.     The Department of Education is vicariously liable under the Section 1681s-1(b) of the Fair Credit Reporting Act for the acts and omissions of its agents. *See, e.g.*, *Henkel v. U.S. Dep't of Educ.*, No. CV 24-1676 (SLS), 2025 WL 2049267, at *15 (D.D.C. July 22, 2025) ("Subsection 1681s-2(b) does not speak directly to the question of vicarious liability, so the Court will join the chorus of courts holding that vicarious liability applies." (citing *Ellis*, 2008 U.S. Dist. LEXIS 129710, at *19–21; *Haddad v. Charles Riley & Assocs.*, No. 09-cv-12597, 2010 U.S. Dist. LEXIS 103623, at *34–38 (E.D. Mich. Apr. 12, 2010); *Feldmann v. Lakeview Loan Servicing L.L.C.*, No. 20-cv-580, 2021 WL 1627048, at *4 (W.D. Wash. Apr. 27, 2021), *partially reconsidered on different grounds*, 2021 WL 2036703 (W.D. Wash. May 21, 2021))).

19.     Because the Department of Education is vicariously liable under 15 U.S.C § 1681s-2(b) for the acts of its agent, Nelnet, and because the Department of Education already has notice regarding which acts or omissions were directly committed by the Department of Education and which acts or omissions were committed by its agent, this Complaint will use the term "Defendant Furnishers" when referring to acts or omissions committed by the DOE, acts or omissions committed by Nelnet, and acts or omissions committed by both entities.

20.     Plaintiff has repeatedly asserted the factual truth—that he is a victim of identity theft and that he did not open the accounts with the Defendant Furnishers that were reporting on his credit. Yet despite this truth, Defendants continued to wrongfully assert that Plaintiff owed thousands of dollars.

21.    Plaintiff brings claims under Section 1681e(b) against Equifax, Trans Union and Experian because each reported inaccurate account information about Plaintiff, including inaccurate information regarding fraudulent accounts with Defendant Furnishers. When Plaintiff disputed the inaccuracies, Equifax, Trans Union, and Experian did not reasonably investigate, also violating Section 1681i.

22.    The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Equifax, Trans Union, and Experian have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax, Trans Union and Experian have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

23.    Plaintiff brings claims under Section 1681s-2(b) against Defendant Furnishers because they received Plaintiff's disputes from the CRAs and thereafter failed to reasonably investigate those disputes. Instead, discovery will show that all Defendant Furnishers did was consult their own records about the accounts and confirm to the CRAs the inaccurate information that they were already reporting. The Defendant Furnishers failed to correct the fraudulent reporting on Plaintiff's credit despite receiving ample notice that Plaintiff is a victim of identity theft.

24.     Plaintiff also asserts related state law causes of action against Defendant Nelnet pursuant to the Qualified Education Loan Servicers provisions of the Virginia Code and the Virginia Consumer Protection Act.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1681p, and 28 U.S.C. § 1367.

26.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) & (2). All Defendants are residents of the Commonwealth of Virginia, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here.

## PARTIES

27.     Plaintiff is a natural person who resided in the Commonwealth of Virginia at all times relevant to the Complaint and was a "consumer" as defined by 15 U.S.C. § 1681a(c).

28.     Equifax is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

29.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

30.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

31.     Experian is a foreign corporation authorized to do business in the Commonwealth of Virginia through its registered agent in Glen Allen, VA.

32.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

33.     Experian disburses consumer reports to third parties under contract for monetary compensation.

34.     Trans Union is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

35.     Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

36.     Trans Union disburses consumer reports to third parties under contract for monetary compensation.

37.     Nelnet, Inc. ("Nelnet") is a financial services corporation with its main headquarters in Lincoln, Nebraska. Nelnet acquired Great Lakes Educational Loan Services, Inc. in 2018. Nelnet does business in Virginia through its registered agent in Richmond, VA.

38.     Nelnet is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

39.     The United States Department of Education ("the DOE") is a federal agency with its headquarters located at 400 Maryland Ave SW, Washington, D.C. The United States attorney for the district where this action is brought is Erik S. Siebert, whose office in this division is located at 919 E Main St., Suite 1900, Richmond, VA  23219.

40. The DOE is a "person" as defined in 15 U.S.C. § 1681a(b).

41. The DOE is a "furnisher" of information as governed by 15 U.S.C. § 1681s-2.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

42. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

43. "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

44.     Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care

imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not
> nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report
> that a credit reporting agency cannot confirm is related to a particular consumer.
> Such information is nearly always "used or expected to be used or collected in
> whole or in part for the purpose of serving as a factor in establishing the consumer's
> eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to
> include misleading information as cavalierly as Trans Union did here negates the
> protections Congress was trying to afford consumers and lending institutions
> involved in credit transactions when it enacted the FCRA….
>
> Congress surely did not intentionally weave an exception into the fabric of the
> FCRA that would destroy its remedial scheme by allowing a credit reporting agency
> to escape responsibility for its carelessness whenever misleading information finds
> its way into a credit report through the agency of a third party….
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA
> and it cannot escape that responsibility as easily as it suggests here. Congress
> clearly intended to ensure that credit reporting agencies exercise care when
> deciding to associate information with a given consumer, and the record clearly
> supports the jury's determination that Trans Union did not exercise sufficient care
> here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

45.     Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a
> consumer report it shall follow reasonable procedures to assure maximum possible
> accuracy of the information concerning the individual about whom the report
> relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D.

Va. Mar. 18, 2011).

46.     The CRAs have plenty of resources to maintain (and follow) reasonable procedures,

yet they choose not to do so because of how those procedures might impact their bottom lines. One

common example of the CRAs' failures to follow the reasonable procedures required by Section

1681e(b) relates to how they blatantly ignore "red flags" in identity theft situations, particularly with regard to the addresses associated with accounts.

47.     CRAs receive consumer data from banks, credit card companies, mortgage servicers, utility companies, and other "furnishers". The CRAs use personally identifiable information ("PII") such as names, social security numbers, dates of birth, and addresses to match incoming data to a particular person's file.

48.     Each CRA chooses how closely the PII provided by a furnisher must match a consumer's PII before the CRA will include the furnished information in that consumer's file. In addition to the furnished name, social security number, and date of birth, the address associated with an account is one of the key items of information that CRAs can use to properly associate an account with an individual. Although certain PII (such as a consumer's date of birth) should never change, it is common (and expected) for a consumer to update their address with their bank and credit card companies when moving to a new address.

49.     In Plaintiff's situation, as is commonly the case with identity theft, the fraudulent accounts were opened using an address that had no association with Plaintiff. While all the furnishers reporting legitimate accounts on Plaintiff's credit continued to provide the CRAs with an address where Plaintiff had lived since 2009 (and where Plaintiff still continues to live), the address provided to the CRAs by the Defendant Furnishers had no connection to Plaintiff whatsoever.

50.     The fraudulent accounts were tied to an address in Norfolk, Virginia, where Plaintiff has never lived, never worked, and never attended school.

51.     All three Defendant CRAs recognize the sudden appearance of a new address as a red flag for fraud. For example, Experian sells "identity protection plans" to consumers and

advertises "Change of address alerts" as features of those plans.[1] The Defendant CRAs even license credit monitoring API to businesses, which alert their customers regarding address changes[2]:

> ⊘ Examples of events that may trigger an alert: New Inquiry, Address Change, Name Change (Equifax only), New Collection, Existing Collection Change, New Account, Existing Account Change, New Bankruptcy, Existing Bankruptcy Change.

52.     Despite the Defendant CRAs all recognizing address "changes" as red flags for fraud, and despite Plaintiff having no association whatsoever with the address used to open the fraudulent student loan accounts, and despite all the other furnishers continuing to report Plaintiff's correct address to the Defendant CRAs, the Defendant CRAs nevertheless followed procedures which ignored the anomalous address and chose to report the fraudulent student loan accounts as belonging to Plaintiff.

53.     While Section 1681e(b) requires CRA to follow reasonable procedures to assure maximum possible accuracy of the information that they report, Section 1681i requires even more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency of the directly… of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

---

[1] Compare Identity Theft Protection Plans and Pricing – Experian, https://www.experian.com/protection/compare-identity-theft-products/ (last visited Oct. 7, 2025).
[2] Credit Report Monitoring | Equifax, https://developer.equifax.com/products/apiproducts/credit-report-monitoring, (last visited Oct. 7, 2025).

54.    Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

55.    It has long been the law that a CRA, such as Equifax, Trans Union or Experian, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

56.    That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other   sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).   Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort

it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

57.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

58.     Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

59.     It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT

(July 2011), at 67.[3]

### *Sections 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty on Defendant Furnishers to Perform a Detailed and Systematic Investigation of a Consumer's Dispute*

60.    Today, furnishers such as Nelnet and the Department of Education have their own

independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. The duties

on furnishers were enacted almost thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING

REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

61.    Furnishers' independent duties under the FCRA include independently

investigating consumer disputes by reviewing all relevant information provided by the CRAs.

Further, the furnisher must report the results of this investigation to the CRAs and accurately

correct, update, or delete incorrect information previously reported to the CRAs.

62.    "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic

examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295,

1303 (11th Cir. 2016) (citations omitted). As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or
> systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see
> Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as
> "a searching inquiry").

> 357 F.3d 426, 430 (4th Cir. 2004).

63.    Additionally, Defendant Furnishers have long been aware that a furnisher must

fully and accurately report to the CRAs the results of an investigation, including whether or not

---

[3] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

the consumer disputes such reporting. *Saunders v. Branch Banking and Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Creditor's failure to report disputed nature of debt to all credit reporting agencies (CRAs), after receiving notice of dispute from one CRA, and conducting investigation and verification, was cognizable as violation of Fair Credit Reporting Act's (FCRA) duty to review and update reports for inaccuracies and omissions.)

### Plaintiff Discovers the CRA Defendants were Reporting Fraudulent Accounts and Disputes Those Inaccuracies

64.    Plaintiff is a victim of identity theft.

65.    An identity thief used Plaintiff's personal information, without Plaintiff's permission, to open fraudulent student loan accounts in Plaintiff's name.

66.    Upon discovering that the student loans had been fraudulently opened in his name, in or around the year 2020, Plaintiff filed a police report, notified the Defendant Furnishers of the fraud, and disputed the information with the CRA Defendants.[4]

67.    Upon information and belief, the Defendants failed to correct the reporting on Plaintiff's credit in response to his disputes.

68.    In or around October of 2023, Plaintiff obtained copies of his credit files with Equifax, Experian, and Trans Union, and discovered that each of the CRA Defendants were reporting three fraudulent student loan accounts with DEPT OF ED/NELNET. In addition, Equifax and Experian were both reporting a fraudulent student loan account with U.S. Department of Education/GLELSI.

---

[4] Upon information and belief, at the time of Plaintiff's 2020 disputes, the student loans were reporting on Plaintiff's credit as an account with U.S. Department of Education/GLELSI.

69.     Plaintiff did not open any of the fraudulent accounts, he did not authorize anyone to open any of the fraudulent accounts on his behalf, and he did not benefit from any of the fraudulent accounts.

70.     In or around December of 2023, Plaintiff mailed written dispute letters to the three Defendant CRAs via USPS first class certified mail, return receipt requested.

71.     In his December 2023 dispute letter to Equifax, Plaintiff disputed Equifax's inaccurate and derogatory reporting of the fraudulent DEPT OF ED/NELNET accounts and the fraudulent U.S. Department of Education/GLELSI account. Plaintiff explained that he never applied for or authorized a student loan for Tidewater Community College.

72.     In his December 2023 dispute letter to Experian, Plaintiff disputed Equifax's inaccurate and derogatory reporting of the fraudulent DEPT OF ED/NELNET accounts and the fraudulent U.S. Department of Education/GLELSI account. Plaintiff explained that he never applied for or authorized a student loan for Tidewater Community College.

73.     In Plaintiff's December 2023 dispute letter to Trans Union, he disputed the fraudulent DEPT OF ED/NELNET accounts on his Trans Union report. Plaintiff explained that he never applied for or authorized a student loan for Tidewater Community College.

74.     On or around December 15, 2023, Trans Union mailed "investigation results" to Plaintiff. The results shows that Trans Union had forwarded Plaintiff's dispute to the Defendant Furnishers, and the Defendant Furnishers had "verified" the fraudulent reporting of the three DEPT OF ED/NELNET accounts. Trans Union and Nelnet continued to report the fraudulent DEPT OF ED/NELNET accounts on Plaintiff's credit.

75.     On or around December 16, 2023, Experian sent dispute results to Plaintiff. In the dispute results, Experian showed that the three DEPT OF ED/NELNET accounts had been deleted

from Plaintiff's report. Experian's dispute results further showed that Nelnet had "updated" its reporting of the Department of Education/GLELSI account. Experian and Nelnet continued to report the fraudulent U.S. Department of Education/GLELSI account on Plaintiff's credit.

76.     On or around December 19, 2023, Equifax sent dispute results to Plaintiff. In the dispute results, Equifax explained that it had forwarded Plaintiff's dispute to the Defendant Furnishers, and the three DEPT OF ED/NELNET accounts had been deleted. Equifax's dispute results further showed that it had "verified" with Nelnet that the U.S. Department of Education/GLELSI account belonged to Plaintiff. Equifax and Nelnet continued to report the fraudulent U.S. Department of Education/GLELSI account on Plaintiff's credit.

77.     Upon information and belief, Defendants are still reporting inaccurate information in Plaintiff's credit files.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

78.     Unknown to Plaintiff until this lawsuit, it has long been the practice of Equifax, Trans Union, and Experian to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Equifax and Trans Union use a vendor, previously known as Intelenet Global Services and now as Teleperformance.

79.     Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[5]

---

[5] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681i failure-

80.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other communication. That mailbox company receives consumer disputes and scans them into a batch with other disputes.

81.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

82.     Both Teleperformance and the Experian affiliates use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

83.     Teleperformance agents and Experian Chile are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

84.     The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

85.     In fact, all three credit reporting agencies strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union and Experian. The dispute is sent

---

to-investigate claim on the same theory—no investigation was conducted by the CRA—as he alleges against Equifax for its farming-out investigations to Teleperformance.

to the Defendant CRAs' creditor customers (such as Capital One) for their sole review and consideration.

86.     Both Equifax and Trans Union have taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

87.     Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

88.     Regardless of whether these statements by the CRAs are correct, the consumer reporting agencies believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

89.     Equifax, Trans Union, and Experian themselves did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely caused the disputes to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *The CRA Defendants Forwarded Plaintiff's Disputes to the Defendant Furnishers, Who Did Nothing*

90.     In each instance in which Plaintiff disputed the fraudulent accounts with the CRAs, the CRAs forwarded Plaintiff's disputes to the Defendant Furnishers using an electronic system

called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results are electronically communicated back to CRAs.

91.    On information and belief, e-Oscar is also the system by which the Defendant Furnishers have agreed they will accept consumer disputes from the CRAs.

92.    Each instance in which the Defendant Furnishers received one of Plaintiff's disputes from a CRA, the Defendant Furnishers became obligated under the FCRA to investigate that dispute.

93.    Plaintiff's disputes to the Defendant Furnishers to attempt to have them investigate his complaints went unanswered.

94.    The Defendant Furnishers failed to investigate Plaintiff's complaints.

95.    Despite Plaintiff providing the Defendant Furnishers with ample notice that he is a victim of identity theft and he does not owe the debt, the Defendant Furnishers continued (and continue still) to report fraudulent information as "accurate" to at least one of the CRAs. Discovery will show that all the Defendant Furnishers did when supposedly investigating Plaintiff's disputes from the CRAs was consult their own internal account records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

96.    On dates better known to Equifax and the Defendant Furnishers, Equifax furnished Plaintiff's disputes to the Defendant Furnishers.

97.    On dates better known to Experian and the Defendant Furnishers, Experian furnished Plaintiff's disputes to the Defendant Furnishers.

98.    On dates better known to Trans Union and the Defendant Furnishers, Trans Union furnished Plaintiff's disputes to the Defendant Furnishers.

99.   At least one of the Defendant CRAs responded to Plaintiff's disputes, claiming the Defendant Furnishers "verified" the reported information as accurate. This response confirms that the Defendant CRAs communicated Plaintiff's disputes to the Defendant Furnishers.

100.   Upon information and belief, the Defendant CRAs timely notified the Defendant Furnishers of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

101.   Alternatively, the Defendant CRAs failed to notify the Defendant Furnishers of Plaintiff's disputes, and/or failed to provide the supporting documents submitted with Plaintiff's disputes.

102.   By their actions as described herein, the Defendant Furnishers furnished and communicated false credit information regarding Plaintiff.

### *Plaintiff Suffered Actual Harm*

103.   The Defendants continued to report the fraudulent accounts on Plaintiff's credit reports even after being notified that this information is false. Upon information and belief, Defendants are *still* reporting fraudulent information on Plaintiff's credit file.

104.   Plaintiff attempted to resolve these matters with Defendants and his credit was significantly destroyed by Defendants' failures to correct the inaccurate reporting.

105.   As a result of the inaccurate credit reporting and illegal use of Plaintiff's reports, Plaintiff has suffered damages, including, but not limited to:

   a.   Harm to Plaintiff's credit opportunities;

   b.   Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

   c.   Loss of time attempting to correct the inaccuracies;

   d.   Stress associated with attempting to resolve this matter;

e.  Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: depression, anxiety, headaches, chest tightness, irritability, sleep loss, stomach pain, nausea, loss of appetite, changes in weight, embarrassment, humiliation, harm to relationships, worsening of existing illness, the need to take medication, difficulty concentrating, harm to reputation, and loss of privacy.

### *Defendants' Conduct was Willful*

106.  The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

107.  Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

108.  As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

109.  The CRA Defendants have received numerous disputes and other complaints regarding the furnishers at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

110.    Just in federal court alone, during the past decade, the creditor-furnishers disputed by Plaintiff have had to defend approximately 326 consumer credit lawsuits.

111.    In many of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

112.    The CRA Defendants knew or should have known of this litigation history.

113.    The CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

114.    The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

115.    Defendants regularly receive unredacted consumer dispute details from this database.

116.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

117.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

118.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

119.    Further, over 230,000 of the CFPB complaints against Equifax, more than 220,000 complaints as to Trans Union, and over 230,000 complaints about Experian were based largely on their failure to reasonably investigate consumer disputes.

120.    Just in the last 12 months alone, Equifax, Trans Union and Experian have each been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

121.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

122.    Equifax, Trans Union and Experian have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

123.    Equifax has even been warned by its home District Court, the Northern District of

Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D.

Ga. Aug. 29, 2005).

124.    Defendants have long had specific notice of these requirements. The seminal

Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable

reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was

a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

125.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

126.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[6]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

127.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

128.    In early 2025, almost two decades after the AG settlement, the Consumer Financial Protection Bureau sued CRA Defendant Experian, seeking injunctive relief, redress, disgorgement, and civil money penalties. In its Complaint, CFPB alleged that:

> Experian violated both [the Fair Credit Reporting Act and the Consumer Financial Protection Act of 2010] by failing to reasonably reinvestigate consumer disputes challenging the accuracy or completeness of information in consumer reports, including by failing to forward all relevant information to furnishers, failing to provide adequate or accurate notice to consumers of the outcome of their disputes, and failing to utilize reasonable procedures to ensure the accuracy and completeness of information in consumers' files.

*Consumer Fin. Prot. Bureau v. Experian Information Solutions, Inc.*, 8:25cv24 (C.D. Cal. Filed Jan. 7 2025).[7]

---

[6]    *Available    at*    https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

[7] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_experian-information-solutions-complaint_2025-01.pdf

129.    As the CFPB summarized, "Despite its obligations under the FCRA, Experian fails consumers who dispute information in their consumer reports at every step of the dispute process." *Id.*

130.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[8]

131.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

132.    Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

---

[8] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

133.    The overwhelming amount of public criticism and growing awareness of the CRAs' failures has led at least one Defendant CRA, Experian, to frequently push for arbitration in lieu of litigation. Addressing so many cases though arbitration has lowered Experian's exposure to justice through the court system. However, arbitrators recognize the substantial amount of evidence demonstrating that Experian willfully disregards the rights of consumers under the FCRA, and they are awarding damages accordingly. In *Duncan v. Experian Information Solutions, Inc.*, which shared many similarities to the underlying facts in this case, Experian reported inaccurate information from PNC Bank on Mr. Duncan's Experian credit report. Although Mr. Duncan disputed the information with Experian, Experian failed to conduct any actual "reinvestigation" of Mr. Duncan's disputes, as required by Section 1681i of the Federal Fair Credit Reporting Act. Instead, Experian relied entirely on the information sent to it by the "furnisher", PNC Bank. The arbitrator in the Duncan case ordered Experian to pay Mr. Duncan "for actual damages $400,000, together with $50,000 for each month it continues to report the PNC information, up to a maximum

of another $300,000." The arbitrator further found Experian's violations to be willful, and ordered that Experian pay Mr. Duncan $700,000 in punitive damages.

134.    Proportionately similar, the Defendant Furnishers have also been sued in federal court at least 326 times for consumer credit claims by consumers – many involving alleged violations of the FCRA.

135.    Further, Since the CFPB database began accepting complaints, Nelnet alone has received approximately 2,387 complaints from consumers for reporting inaccurate information on consumer credit reports. At least 474 of these complaints are about Nelnet not fixing a credit reporting error after receiving a consumer's dispute.

136.    The Defendant Furnishers had notice of and their lawyers or other management employees responsible for FCRA compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

137.    The Defendant Furnishers had notice of and their lawyers or other management employees responsible for FCRA compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

138.    The Defendant Furnishers had notice of and their lawyers or other management employees responsible for FCRA compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

139.    The Defendant Furnishers had notice of and their lawyers or other management employees responsible for FCRA compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

140.    The Defendant Furnishers had notice of and their lawyers or other management employees responsible for FCRA compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F.

App'x 354 (6th Cir. 2005).

141.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because they believe that it would cost too much money to do so.

142.    Defendants' procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

**CLAIMS FOR RELIEF**

**COUNT I:**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b)**
*against Equifax, Experian, and Trans Union*

143.    Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

144.    Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the fraudulent account information from Defendant Furnishers.

145.    As a result of Equifax's, Trans Union's, and Experian's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression, anxiety, headaches, chest tightness, irritability, sleep loss, stomach pain, nausea, loss of appetite, changes in weight, embarrassment, humiliation, harm to relationships, worsening of existing illness, the need to take medication, difficulty concentrating, harm to reputation, and loss of privacy.

146.    Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Equifax, Trans Union,

and Experian each ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

147.    Equifax, Trans Union, and Experian each furnished multiple consumer reports to third parties containing the inaccurate student loan account information and they did so after receiving notice of these inaccuracies.

148.    The violations by Equifax, Trans Union and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Trans Union, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

149.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Trans Union, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)**
*against Equifax, Experian, and Trans Union*

150.    Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

151.    Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from each of Plaintiff' credit files.

152.    Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(2) by their conduct which includes, but is not limited to, failing to send to the furnishers all relevant information that they received with Plaintiff's disputes.

153.    Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the Defendant Furnisher accounts.

154.    Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff' credit files or modify the item of information upon a lawful reinvestigation.

155.    After receiving Plaintiff's December 2023 letter, Trans Union failed to provide Plaintiff with "a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation . . .", in violation of 15 U.S.C. § 1681i(a)(6)(B)(ii).

156.    As a result of Equifax's, Trans Union's, and Experian's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression, anxiety, headaches, chest tightness, irritability, sleep loss, stomach pain, nausea, loss of appetite, changes in weight, embarrassment, humiliation, harm to relationships, worsening of existing illness, the need to take medication, difficulty concentrating, harm to reputation, and loss of privacy.

157.    The violations by Equifax, Trans Union and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Trans Union, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

158.     Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Trans Union, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT III**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(A) & (B)**
*against Nelnet and the Department of Education*

159.     Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

160.     Defendant Furnishers violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct reasonable investigations of Plaintiff's disputes after his disputes were furnished directly to them by Equifax, Experian, and Trans Union.

161.     Defendant Furnishers violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Equifax, Experian, and Trans Union forwarded Plaintiff's disputes to them.

162.     As a result of Defendant Furnishers' conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression, anxiety, headaches, chest tightness, irritability, sleep loss, stomach pain, nausea, loss of appetite, changes in weight, embarrassment, humiliation, harm to relationships, worsening of existing illness, the need to take medication, difficulty concentrating, harm to reputation, and loss of privacy.

163.     The violations by Defendant Furnishers were willful, rendering Defendant Furnishers liable for punitive damages in an amount to be determined by the Court pursuant to 15

U.S.C. § 1681n. In the alternative, Defendant Furnishers were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

164.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Defendant Furnishers in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT IV**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(C) & (D)**
*against Nelnet and the Department of Education*

165.    Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

166.    On one or more occasions within the past two years, by example only and without limitation, Defendant Furnishers violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the false information within Plaintiff's credit file with Trans Union in response to his disputes without also including an accurate notation that the debt was disputed and by failing to correctly report results of an accurate investigation to the Defendant CRAs.

167.    On information and belief, Plaintiff alleges that Defendant Furnishers rarely if ever add the correct notation indicating that the account is disputed when they respond to the e-Oscar ACDVs.

168.    Plaintiff's disputes were, at minimum, bona fide.

169.    As a result of these violations of 15 U.S.C. § 1681s-2(b)(C) and (D), Plaintiff suffered actual damages including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression, anxiety, headaches, chest tightness, irritability, sleep loss, stomach pain, nausea, loss of appetite, changes in weight,

embarrassment, humiliation, harm to relationships, worsening of existing illness, the need to take medication, difficulty concentrating, harm to reputation, and loss of privacy.

170.    Defendant Furnishers were aware of the *Saunders v. Branch Banking & Trust* FCRA decision by the Fourth Circuit when they followed the ACDV procedures used regarding Plaintiff's disputes.

171.    On information and belief, Plaintiff alleges that the procedures followed regarding Plaintiff's FCRA disputes through e-Oscar were the procedures that Defendant Furnishers intended their employees or agents to follow.

172.    On information and belief, Plaintiff alleges that Defendant Furnishers' employees or agents did not make a mistake in the way they followed Defendant Furnishers' procedures when they received, processed and responded to the Trans Union ACDV(s) and did not include a proper notation regarding the account being in dispute.

173.    On information and belief, the Plaintiff alleges that Defendant Furnishers have not materially changed their FCRA investigation procedures regarding the notation of a dispute in ACDVs after learning of their failures in this case.

174.    The violations by Defendant Furnishers were willful, rendering Defendant Furnishers liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant Furnishers were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

175.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Defendant Furnishers in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT V**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(E)**

*against Nelnet and the Department of Education*

176. Plaintiff realleges and incorporates all factual allegations in the Complaint as it fully set out herein.

177. Defendant Furnishers violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete information from Plaintiff's file after receiving Plaintiff's disputes from the CRAs and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Defendant Furnishers' failures to investigate as articulated herein, after Defendant Furnishers received notice of Plaintiff's disputes from the CRAs.

178. As a result of this conduct (the action and inaction of Defendant Furnishers), Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression, anxiety, headaches, chest tightness, irritability, sleep loss, stomach pain, nausea, loss of appetite, changes in weight, embarrassment, humiliation, harm to relationships, worsening of existing illness, the need to take medication, difficulty concentrating, harm to reputation, and loss of privacy.

179. The violations by Defendant Furnishers were willful, rendering Defendant Furnishers liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant Furnishers were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

180. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Defendant Furnishers in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT VI**
**VIOLATIONS OF THE QUALIFIED EDUCATION LOAN SERVICERS PROVISIONS**
**OF THE VIRGINIA CODE, VA. CODE § 6.2-2610(A)(2)**
*against Nelnet*

181.    Plaintiff realleges and incorporates all factual allegations set forth in the Complaint.

182.    Pursuant to § 6.2-2610(A)(2) of the Virginia Code, Nelnet is prohibited from engaging in any unfair or deceptive act or practice toward any person or misrepresent[ing] or omit[ing] any material information in connection with the servicing of a qualified education loan, including misrepresenting (i) the amount, nature, or terms of any fee or payment due or claimed to be due on a qualified education loan; (ii) the terms and conditions of the loan agreement; or (iii) the borrower's obligations under the loan.

183.    Each time that Nelnet furnished information to a CRA about any of the accounts at issue in this Complaint, Nelnet misrepresented the amount due on a qualified education loan.

184.    Nelnet has repeatedly engaged in unfair and deceptive acts and misrepresented, in its communications with Plaintiff, the amounts by Plaintiff, Plaintiff's obligations on those accounts, and the terms and conditions of those accounts.

185.    As a result of this conduct (the action and inaction of Nelnet), Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression, anxiety, headaches, chest tightness, irritability, sleep loss, stomach pain, nausea, loss of appetite, changes in weight, embarrassment, humiliation, harm to relationships, worsening of existing illness, the need to take medication, difficulty concentrating, harm to reputation, and loss of privacy.

186.    The violations by Nelnet also warrant punitive damages in an amount to be determined by the Court pursuant to Va. Code § 6.2-2619(A)(4).

187.    Plaintiff is entitled to recover actual damages or statutory damages of $500 per violation (whichever is greater), punitive damages, costs, and attorney's fees from Nelnet in an amount to be determined by the Court pursuant to Va. Code § 6.2-2619.

## COUNT VII
## VIOLATIONS OF THE QUALIFIED EDUCATION LOAN SERVICERS PROVISIONS
### OF THE VIRGINIA CODE, VA. CODE § 6.2-2610(A)(5)
#### *against Nelnet*

188.    Plaintiff realleges and incorporates all factual allegations set forth in the Complaint.

189.    Pursuant to § 6.2-2610(A)(5) of the Virginia Code, Nelnet is prohibited from providing inaccurate information to a nationally recognized consumer credit bureau.

190.    Each time that Nelnet furnished information to a CRA about any of the accounts at issue in this Complaint, Nelnet violated Va. Code § 6.2-2610(A)(5).

191.    As a result of this conduct (the action and inaction of Nelnet), Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression, anxiety, headaches, chest tightness, irritability, sleep loss, stomach pain, nausea, loss of appetite, changes in weight, embarrassment, humiliation, harm to relationships, worsening of existing illness, the need to take medication, difficulty concentrating, harm to reputation, and loss of privacy.

192.    The violations by Nelnet also warrant punitive damages in an amount to be determined by the Court pursuant to Va. Code § 6.2-2619(A)(4).

193.    Plaintiff is entitled to recover actual damages or statutory damages of $500 per violation (whichever is greater), punitive damages, costs, and attorney's fees from Nelnet in an amount to be determined by the Court pursuant to Va. Code § 6.2-2619.

## COUNT VIII
## VIOLATIONS OF THE QUALIFIED EDUCATION LOAN SERVICERS PROVISIONS
### OF THE VIRGINIA CODE, VA. CODE § 6.2-2619(A)(2)
#### *against Nelnet*

194.    Plaintiff realleges and incorporates all factual allegations set forth in the Complaint.

195.    Pursuant to § 6.2-2619 of the Virginia Code, Nelnet is required to "comply with all applicable federal laws related to qualified education loan servicing, as from time to time amended, and the regulations promulgated thereunder."

196.    Nelnet violated Va. Code § 6.2-2619 each time it violated the Federal Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(A)-(E) as alleged above.

197.    As a result of this conduct (the action and inaction of Nelnet), Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression, anxiety, headaches, chest tightness, irritability, sleep loss, stomach pain, nausea, loss of appetite, changes in weight, embarrassment, humiliation, harm to relationships, worsening of existing illness, the need to take medication, difficulty concentrating, harm to reputation, and loss of privacy.

198.    The violations by Nelnet also warrant punitive damages in an amount to be determined by the Court pursuant to Va. Code § 6.2-2619(A)(4).

199.    Plaintiff is entitled to recover actual damages or statutory damages of $500 per violation (whichever is greater), punitive damages, costs, and attorney's fees from Nelnet in an amount to be determined by the Court pursuant to Va. Code § 6.2-2619.

### COUNT IX
### VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT,
### VA. CODE § 59.1-200
### *against Nelnet*

200.    Plaintiff realleges and incorporates all factual allegations set forth in the Complaint.

201.    Pursuant to Va. Code § 6.2-2621, any violation of the provisions of the chapter on Qualified Education Loan Servicers, Va. Code §§ 6.2-2600 - 6.2-2622, "shall constitute a prohibited practice in accordance with § 59.1-200 and shall be subject to any and all of the enforcement provisions of the Virginia Consumer Protection Act."

202.    Each time that Nelnet violated Va. Code §§ 6.2-2610(A)(2), 6.2-2610(A)(5), & 6.2-2619(A)(2), Nelnet also violated Va. Code § 59.1-200.

203.    As a result of this conduct (the action and inaction of Nelnet), Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression, anxiety, headaches, chest tightness, irritability, sleep loss, stomach pain, nausea, loss of appetite, changes in weight, embarrassment, humiliation, harm to relationships, worsening of existing illness, the need to take medication, difficulty concentrating, harm to reputation, and loss of privacy.

204.    Plaintiff has sustained the damages set forth above as a proximate result of Nelnet's willful violations of the VCPA.

205.    Pursuant to Va. Code § 59.1-204(A), there are grounds for this Court to enter a judgment in favor of Plaintiff and against Nelnet for actual damages, or alternatively, for statutory damages.

206.    There are grounds for this Court to enter a judgment in favor of Plaintiff against Nelnet for treble damages pursuant to Va. Code § 59.1-204(A).

207.    Pursuant to Va. Code § 59.1-204(B), there are grounds for this Court to enter an order requiring Nelnet to pay Plaintiff's reasonable attorney's fees and costs.

208.    In the alternative, in the event the Court determines that Nelnet's violations of the VCPA were not willful, Plaintiff is entitled to actual or statutory damages, reasonable attorney's fees, and costs pursuant to Va. Code § 59.1-207.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)     Award Plaintiff actual and punitive damages for violations of the FCRA by

Equifax, Experian, Trans Union, and Defendant Furnishers;

(2)     Award Plaintiff attorney's fees and costs under the FCRA;

(3)     Award Plaintiff actual damages and punitive damages for violations of the

Qualified Education Loan Servicers provisions of the Virginia Code;

(4)     Award Plaintiff attorney's fees and costs under the Qualified Education Loan

Servicers provisions of the Virginia Code;

(5)     Award Plaintiff actual damages and punitive damages for violations of the VCPA;

(6)     Award Plaintiff attorney's fees and costs under the VCPA;

(7)     Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(8)     Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

ANTONIO HARRIS

By:

/s/ *Leonard A. Bennett*
Leonard A. Bennett, VSB #37523
Mark C. Leffler, VSB #40712
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662- Fax
Email: lenbennett@clalegal.com
Email: mark@clalegal.com

*Counsel for Plaintiff*